Opinion issued October 24, 2002











 





In The

Court of Appeals

For The

First District of Texas





 NOS. 01-02-00167-CR
 01-02-00168-CR

 01-02-00169-CR

 01-02-00170-CR

____________


ISAIAH HICKS, Appellant


V.


THE STATE OF TEXAS, Appellee






On Appeal from the 185th District Court

Harris County, Texas

Trial Court Cause Nos. 877475, 877477, 877797, and 877798






O P I N I O N

 In a single trial, a jury found appellant, Isaiah Hicks, guilty of four separate
offenses of aggravated robbery. The trial court found a deadly weapon was used in
the commission of each offense and assessed appellant's punishment at 60 years
confinement in each case, with the sentences to run concurrently.

 In three points of error, appellant argues: (1) he received ineffective assistance
of counsel, (2) the testimony of a police officer regarding "parole papers" found in
appellant's car was improper and harmful, and (3) the evidence was factually
insufficient to support two of his four convictions. We affirm.

Facts and Procedural Background


 Alexis Hernandez testified that, on January 31, 2001, while he was employed
as a Pizza Hut delivery driver, he delivered a pizza to the Milano Apartments between
7:00 and 8:30 p.m. When Hernandez returned to his truck in the parking lot, he felt
a gun pressed to his back and heard a man tell him to "[g]ive me all your money." 
Without turning around, Hernandez reached into his pocket and handed over all of
his money. The robber then looked inside the interior of Hernandez's truck for more
money, and Hernandez was able to see the face of the man, whom he later identified
as appellant. Hernandez saw that appellant had a gun and feared appellant would kill
him. Appellant then asked Hernandez if he had any more money, and, after
Hernandez told him he did not, appellant told Hernandez to "run away." Hernandez
then got in his truck and drove back to the Pizza Hut.

 Hernandez told his boss what had happened, and they called the Houston
Police Department. Hernandez described the robber to the police as an African-American male, being approximately 40 to 42 years old, weighing approximately 190
to 210 pounds, and wearing a black hat "for the cold time," a black t-shirt, long black
leather coat, and black pants and shoes. Hernandez did not recall giving any
description of the robber's hair or face. Hernandez described the parking lot where
he was robbed as having "good light."

 Hernandez further testified that a police officer subsequently brought a
videotaped lineup to his house for him to review. After viewing the lineup,
Hernandez identified appellant as the man who had robbed him. Hernandez then
listened to the voices of the lineup participants and again identified appellant.

 Marcus O'Conor testified that, between 8:00 and 9:00 p.m. on February 6,
2001, as he was unloading groceries from his car in the parking lot of the Milano
Apartments, where he and his wife lived, he was robbed at gunpoint. As O'Conor
reached into his trunk to pick up the grocery bags, he felt something press into his
back and heard a man's voice tell him not to turn around and to "[g]ive me your
money." O'Conor dropped the grocery bags he was holding, and appellant came
around to O'Conor's right side and stood in front of him. O'Conor testified that the
parking lot was illuminated by floodlights and he was able to clearly see the face of
the robber, whom he later identified as appellant. O'Conor placed his money, wallet,
keys, and wristwatch on the ground and took a step back. Appellant picked up
O'Conor's belongings and then looked in the trunk and passenger compartment of
O'Conor's car. Appellant asked O'Conor if anyone was at O'Conor's apartment, and
O'Conor told appellant his wife and child were home. (1) Appellant then left on foot. 
During most of their encounter, appellant kept a pistol pointed at O'Conor, and
O'Conor testified that he feared he would be killed. O'Conor described the weapon
appellant used as a "German" style "Ruger or Luger."

 O'Conor called the Houston Police Department and subsequently gave the
investigating officer a general description of the robber. O'Conor described the
robber as being an African-American male, having a clean-shaven face, having short
hair or wearing a cap, wearing a knee-length coat, standing approximately 5'7" to 5'8"
tall, weighing 235 to 245 pounds, and being 32 to 36 years old. Approximately three
months after the robbery, O'Conor viewed a photographic array prepared by the
police, which included a photograph of appellant along with photographs of five
other men with similar physical features. O'Conor identified the photographs of
appellant and another man as resembling the robber. O'Conor subsequently picked
appellant out of a videotaped lineup and testified that he immediately recognized
appellant's face, voice, and gait.

 Anthony Hoffpauir, also a resident of the Milano Apartments, testified that, on
the evening of March 12, 2001, he took his dog for a walk in the common area of the
complex. As Hoffpauir walked his dog across the parking lot to a grassy area, he
heard someone tell him to "[s]top." When Hoffpauir turned around, he was standing
face-to-face with a man, whom he later identified as appellant, holding a gun against
Hoffpauir's stomach. Appellant ordered Hoffpauir to "[g]ive me all your money." 
When Hoffpauir handed appellant approximately $18, appellant became angry and
demanded, "Where's the rest of it?" Hoffpauir told appellant he did not have any
more money, and appellant then took Hoffpauir's wallet. Appellant took Hoffpauir's
credit cards and ATM card out of the wallet and demanded to know Hoffpauir's PIN
number. After initially telling appellant he could not remember his PIN number,
Hoffpauir gave appellant a fabricated PIN number. During his encounter with
Hoffpauir, appellant kept the gun pressed against Hoffpauir's stomach.

 Appellant then told Hoffpauir to turn around and walk back to Hoffpauir's
apartment and that, if he turned around, appellant would shoot him. Hoffpauir
testified that he was "scared to death" as he walked back to his apartment. When he
reached his apartment, appellant was gone. Hoffpauir then called the Houston Police
Department.

 Hoffpauir told the police that appellant was a heavy-set, African-American
man, standing approximately 5'10" tall, having "scruffy" facial hair, and wearing dark
clothes. He subsequently viewed a live lineup and identified appellant as the man
who had robbed him. Hoffpauir described appellant's pistol as a "Ruger .22, small
caliber."

 Jeffrey Stephens, another resident of the Milano Apartments, testified that, on
April 17, 2001, as he was returning home between 10:00 and 11:00 p.m., he saw a
man, whom he later identified in court as appellant, bent over behind some bushes. 
After Stephens unlocked his apartment door, appellant grabbed him, turned him
around, pointed a pistol at his head, and said, "Give me your money, you white
motherfucker." Stephens testified that he could see appellant's face because of the
lighting and because he was standing "eye to eye" with appellant. Stephens gave
appellant approximately $150, and appellant then left on foot. After appellant left,
Stephens went into his apartment, told his wife he had just been robbed, and called
the Houston Police Department.

 Stephens described appellant to the police as being an African-American male,
having stocky arms with a tattoo on his left arm, having a "thin" mustache, standing
shorter than 5'10" tall, weighing approximately 215 to 220 pounds, and wearing blue
jeans and a black ski cap. Stephens testified that he owned several guns, including
a pistol "just like" the one used by appellant, and he described the gun appellant used
as a .22 caliber Ruger pistol.

 Stephens later viewed a photographic array prepared by the police, which
contained a photograph of appellant along with photographs of five other men with
similar physical features. Stephens identified appellant as the man who had robbed
him. Stephens also attended a live lineup and again identified appellant as the robber.

 Houston Police Officer Colleen Guidry testified that she investigated the
robberies at the apartment complex. Based on a report of a suspicious vehicle at the
apartment complex, Officer Guidry subsequently focused her investigation on
appellant as a suspect in the robberies. Appellant is 42 years old, 5'8" tall, and
weighs 220 pounds. Based on Stephens's identification of appellant from the
photographic array as the man who had robbed him, Officer Guidry obtained a
warrant for appellant's arrest. Officer Guidry also testified that, according to her
notes, Hernandez had told her the robber had a mustache. On cross-examination,
Guidry admitted that appellant was the only person in the live lineup whose
photograph was also in the photographic array she prepared.

 Houston Police Officer Lewis Childress testified that, when appellant was
arrested, a .22 caliber Ruger pistol was recovered from under the driver's seat of the
car appellant was driving. Police also recovered a wristwatch from the car. O'Conor
testified that the watch was identical to the one taken from him by the robber.

 Houston Police Deputy Administrator Ralph Saldivar testified that, at the time
of the robberies, he was a latent-fingerprint examiner. No fingerprint matches were
made in this case because the fingerprints obtained did not contain sufficient points
for identification.

 Several witnesses testified on appellant's behalf regarding his appearance. 
Sonya Smith-Lewellyn, appellant's cousin's wife, testified that she had seen appellant
in late 2000 and early 2001 and that, on each occasion, appellant was bald and had
a mustache. Jason Terry, appellant's friend, testified that he met appellant in April
2001 and that appellant was bald and had a mustache. Lottie Whittaker, a friend of
appellant's mother, testified that she saw appellant on three occasions in late 2000
and that, each time she saw him, appellant was bald and had a mustache. Appellant's
13-year-old nephew testified that he saw appellant on a daily basis in early 2001 and
that appellant was always bald, but would sometimes shave off his mustache
completely. Ruby Byrd testified that she saw appellant in 2000 and again in April
2001, when he accompanied her son home from work, and that, each time she saw
him, appellant was bald and had a mustache. Dollie Hicks, appellant's mother,
testified that, in the first six months of 2001, appellant was bald and had a mustache. 
Alvin Magee, appellant's co-worker, testified that, beginning in January 2001, he saw
appellant at work every day and appellant was always bald and had a mustache.

 Doris Hicks, appellant's sister, testified that she and appellant had purchased
the car appellant was driving at the time of his arrest. Hicks also testified that
appellant had been bald since he was eight years old. She recalled that, in early 2001, 
appellant had a "little" mustache.

 Shirley Johnson, the mother of appellant's girlfriend, testified that, beginning
in February 2001, she saw appellant at her house every day while he was dating her
daughter. Appellant would arrive at approximately 6:00 p.m. and either stay or take
her daughter out until approximately 2:00 a.m. Kenyah Johnson, appellant's
girlfriend, testified that, based on notes she made on her calendar, she was with
appellant at the times of three of the robberies. Johnson testified that appellant picked
her up at her house for their first date at approximately 10:00 p.m. on February 6,
2001, the night O'Conor was robbed, and they went out to dinner. Johnson testified
that, on March 12, 2001, the night Hoffpauir was robbed, she was with appellant from
approximately 6:00 p.m. until sometime after midnight, when appellant took her
home. Johnson also testified that she was with appellant on the evening of April 17,
2001, the night Stephens was robbed. Johnson admitted, however, that she did not
see appellant for a period of over two hours that evening, beginning at about 8:00
p.m. She testified that, during this time, appellant went to an auto parts store. 
Johnson testified that every time she saw appellant, he was bald and had a mustache.

Ineffective Assistance of Counsel


 In his first point of error, appellant argues he was denied his constitutional right
to effective assistance of counsel (2) because his trial counsel failed to object to (1)
O'Conor's in-court identification of appellant, (2) Hernandez's in-court identification
of appellant, and (3) the admission of extraneous offense evidence.

 To prevail on a claim of ineffective assistance of counsel, an appellant must
demonstrate that counsel's representation fell below an objective standard of
reasonableness based on prevailing professional norms and that, but for counsel's
errors, there is a reasonable probability the result of the proceeding would have been
different. Strickland v. Washington, 466 U.S. 668, 688, 694, 104 S. Ct. 2052, 2064-65, 2068 (1984); Hernandez v. State, 726 S.W.2d 53, 57 (Tex. Crim. App. 1986). A
"reasonable probability" is defined as a probability sufficient to undermine
confidence in the outcome. Thompson v. State, 9 S.W.3d 808, 813 (Tex. Crim. App.
1999); Jackson v. State, 973 S.W.2d 954, 956 (Tex. Crim. App. 1998). It is an
appellant's burden to prove a claim of ineffective assistance of counsel by a
preponderance of the evidence. Thompson, 9 S.W.3d at 813; Jackson, 973 S.W.2d
at 956; McFarland v. State, 845 S.W.2d 824, 843 (Tex. Crim. App. 1992). An
appellant must satisfy both prongs of the Strickland test, or the claim of ineffective
assistance will fail. Id., 466 U.S. at 697, 104 S. Ct. 2052; Garcia v. State, 57 S.W.3d
436, 440 (Tex. Crim. App. 2001).

O'Conor's Identification of Appellant

 Appellant argues that his counsel was ineffective for failing to object to
O'Conor's in-court identification of appellant as the man who had robbed him
because the in-court identification was tainted by an unduly suggestive pre-trial
identification procedure.

 An in-court identification is inadmissible when it has been tainted by an
impermissibly suggestive pre-trial identification procedure. Ibarra v. State, 11
S.W.3d 189, 195 (Tex. Crim. App. 1999). The test is whether, considering the totality
of the circumstances, the pre-trial identification procedure was so impermissibly
suggestive as to give rise to a substantial likelihood of irreparable misidentification. 
Id. In assessing the reliability of the identification, we weigh the following five, non-exclusive factors against the possible corrupting effect of any suggestive pre-trial
identification procedure: (1) the opportunity of the witness to view the criminal at the
time of the crime; (2) the witness's degree of attention; (3) the accuracy of the
witness's prior description of the criminal; (4) the level of certainty demonstrated by
the witness at the confrontation; and (5) the length of time between the crime and the
confrontation. Id., 11 S.W.3d at 195 (citing Neil v. Biggers, 409 U.S. 188, 199, 93
S. Ct. 375, 382 (1972)). "[I]f the totality of the circumstances reveals no substantial
likelihood of misidentification despite a suggestive pretrial procedure, subsequent
identification testimony will be deemed 'reliable[.]'" Webb v. State, 760 S.W.2d 263,
269 (Tex. Crim. App. 1988).

 Here, O'Conor testified that, when shown the photographic array by Officer
Guidry, he selected the photographs of appellant and another man as possible
suspects. O'Conor subsequently identified appellant in a videotaped line-up. Officer
Guidry testified that appellant was the only person in the line-up whose photograph
also appeared in the photographic array. Appellant argues that his inclusion in the
line-up, combined with the absence of anyone else from the photographic array, was
unduly suggestive.

 At trial, O'Conor identified appellant as the man who had robbed him. 
O'Conor testified he was able to see appellant's face and hear his voice during the
robbery. O'Conor described the robber to police as having a clean-shaven face, being
an African-American male approximately 32 to 36 years old, standing approximately
5'7" to 5'8" tall, weighing 235 to 245 pounds, having short hair or wearing a cap, and
wearing a knee-length coat. Although O'Conor described appellant as younger and
heavier than he appeared at the time of trial, the testimony from the witnesses on
behalf of appellant was equivocal concerning whether appellant always had a
mustache or occasionally shaved it off. In addition, although the defense witnesses
testified that appellant was always bald, O'Conor was not certain whether appellant
had short hair or was wearing a cap. Approximately three months after the robbery,
O'Conor viewed a photographic array prepared by the police, which included a
picture of appellant. O'Conor identified the photographs of appellant and another
man as resembling the robber. O'Conor subsequently picked appellant out of a
videotaped lineup, and he testified that he immediately recognized appellant's face,
voice, and gait.

 Based on the totality of the circumstances presented in the record, we conclude
the pre-trial identification procedure was not so impermissibly suggestive as to give
rise to a substantial likelihood of irreparable misidentification of appellant by
O'Conor. Accordingly, we hold appellant's counsel did not render ineffective
assistance by failing to object to O'Conor's in-court identification of appellant.

Hernandez's Identification of Appellant

 At trial, Hernandez identified appellant as the man who had robbed him. 
Hernandez testified that he described the robber to the police as being an African-American male approximately 40 to 42 years old, weighing approximately 190 to 210
pounds, and wearing a black ski cap, a black t-shirt, long black leather coat, and black
pants and shoes. Although Hernandez did not recall giving any description of the
robber's hair or face, Officer Guidry testified that Hernandez told her the robber had
a mustache and a short "afro" haircut.

 Hernandez described the parking lot where he was robbed as having "good
light." He testified that, although he was not initially facing the robber, during the
robbery he was able to see the man's face and hear his voice. Hernandez was not
shown a photographic array, and he saw the videotaped line-up approximately five
months after the robbery. Upon viewing the lineup, Hernandez identified appellant
as the man who had robbed him. He then listened to the voices of the lineup
participants with his eyes closed. Hernandez testified that Officer Guidry asked him,
"Is this the guy?" when Hernandez reacted to appellant's voice. Appellant argues that
Officer Guidry's question was impermissibly suggestive. However, Hernandez
testified that, when he opened his eyes, he again identified appellant as the robber
based on his appearance and his voice.

 Based on the totality of the circumstances presented in the record, we conclude
the pre-trial identification procedure was not so impermissibly suggestive as to give
rise to a substantial likelihood of irreparable misidentification of appellant by
Hernandez. Accordingly, we hold appellant's counsel did not render ineffective
assistance by failing to object to Hernandez's in-court identification of appellant.

Extraneous Offense Evidence

 Appellant also contends his trial counsel was deficient for failing to object to
the admission of evidence of extraneous robbery offenses. However, appellant
provides no explanation of the nature of such evidence or reference to the record
showing that such evidence was admitted. Further, the record contains no reference
to such evidence. Accordingly, this portion of appellant's first point of error is
waived. Tex. R. App. P. 38.1(h).

 We overrule appellant's first point of error.

Testimony of Officer


 In his second point of error, appellant argues that unresponsive testimony from
a police officer regarding parole papers found in the car appellant was driving placed
extraneous offense evidence before the jury and was harmful.

 During appellant's cross-examination of Officer Lewis Childress, the following
exchange occurred:

 Q: Did you find any bank cards or credit cards or anything like that
in the car?


 A: I did not, but there was [sic] some papers like that found, yes, sir.


 Q: The credit cards and bank cards that were found, do you know
who they belonged to?


 A: I do not know. I'd have to look at the report.


 Q: Do you have copy of the report with you?


 A: I do not. I've got one out in the hallway. The District Attorney
might have one. Give me just a second. This is the whole report,
not just our supplement. . . . I do not see credit card. Personal
papers and parole papers and stuff were found in the car in our
supplement.


 [Defense counsel]: I'm going to object, Your Honor, to that
response, limine [sic].


 The Court: I'm sorry.


 [Defense counsel]: May we approach, Your Honor.


 The Court: Sure.


 [Defense counsel]: I'm objecting because the prosecution witness
just said he found parole papers in the car. 
That's a violation of the motion in limine.


 The Court: Counsel, first of all, that's not what I
understood him to say, though he may have
said that, but your objection is overruled. 
You asked the question.


 [Defense counsel]: I asked the question if he found any bank
cards or credit cards. I didn't ask him what
else he found, Judge.


 The Court: Okay. Have your seat.


(Emphasis added.)

 From the record, it is clear that the officer's testimony was not responsive to
the question from appellant's counsel concerning whether "credit cards or bank
cards" were found in the car. Thus, the trial court erred in overruling appellant's
objection to the officer's testimony.

 We must next consider whether the officer's testimony regarding "parole
papers" was harmful. We shall not reverse a conviction for the erroneous admission
of evidence if, after examining the record as a whole, there is fair assurance that the
error did not influence the jury or had but a slight effect. Tex. R. App. P. 44.2(b);
Johnson v. State, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998).

 Following the officer's testimony, neither the State nor appellant made any
further mention of the "parole papers," nor was it ever established that the papers
belonged or referred to appellant. All four eyewitnesses identified appellant as the
man who had robbed them. Upon appellant's arrest, police officers recovered from
appellant's car a .22 caliber Ruger pistol, which matched the eyewitnesses'
description of the gun used in the robberies, and a man's wristwatch identical to the
one stolen from O'Conor.

 After examining the record as a whole, we conclude there is a fair assurance
that the trial court's error in overruling appellant's objection to the officer's reference
to "parole papers" did not influence the jury or had but a slight effect in its
determination that appellant was guilty of the charged offenses. Thus, we hold the
error was harmless.

 We overrule appellant's second point of error.

Sufficiency of the Evidence


 In his third point of error, appellant argues the evidence was factually
insufficient to support his convictions for two of the aggravated robberies. 
Specifically, appellant challenges his identification as the man who robbed Hoffpauir
and Stephens. Appellant does not challenge the sufficiency of the evidence to
support his convictions for the aggravated robberies of O'Conor or Hernandez.

 Under the factual sufficiency standard, we ask whether a neutral review of all
the evidence, both for and against the finding, demonstrates that the proof of guilt is
so obviously weak as to undermine confidence in the jury's determination or whether
the proof of guilt, although adequate if taken alone, is greatly outweighed by contrary
proof. King v. State, 29 S.W.3d 556, 563 (Tex. Crim. App. 2000). Accordingly, we
will reverse the fact finder's determination only if a manifest injustice has occurred. 
Id. In conducting this analysis, we may disagree with the jury's determination, even
if probative evidence supports the verdict, but we must avoid substituting our
judgment for that of the fact finder. Id.

 What weight to give contradictory, testimonial evidence is within the sole
province of the jury because it turns on an evaluation of credibility and demeanor. 
Cain v. State, 958 S.W.2d 404, 408-09 (Tex. Crim. App. 1997). A jury decision is
not manifestly unjust merely because the jury resolved conflicting views of the
evidence in favor of the State. Id. at 410.

 Appellant contends that Hoffpauir failed to accurately identify him as the
robber because, during direct examination, Hoffpauir recalled that, when he identified
appellant in the line-up, appellant was "the last man on the right." The record
indicates that appellant was included in this line-up, but stood in the second position
from the right. Appellant also challenges Hoffpauir's identification of him because
at trial, Hoffpauir could not recall some of the details of the robber's description he
gave to the police. However, Hoffpauir testified he was able to clearly observe
appellant's face at close range during the robbery, and he positively identified
appellant in the live line-up and at trial as the man who had robbed him. Hoffpauir
also described the gun used in the robbery as a .22 caliber Ruger, the same type of
gun recovered from appellant's car when he was arrested.

 Weighing all the evidence neutrally, we hold the evidence was factually
sufficient to support appellant's conviction for the aggravated robbery of Hoffpauir.

 Appellant also challenges the factual sufficiency of the evidence to support
Stephens's identification of him as the robber. Appellant correctly points out that,
although Stephens described the robber as having a tattoo on his left arm, the record
is silent concerning whether appellant had any tattoos. (3) Appellant also contends
Stephens never identified him at trial as the robber. Contrary to appellant's assertion,
the record reflects that Stephens did identify appellant during direct examination as
the man who had robbed him when he identified "the defendant" as the man he first
saw "sticking his head around the bushes" looking at him and who then robbed him
at gunpoint. Stephens testified that, during the robbery, he was "eye to eye" with
appellant, and he identified appellant from both a photographic array and a live lineup
as the man who had robbed him. Stephens, who testified that he owns a pistol "just
like" the one used by the robber, described the gun as a .22 caliber Ruger pistol, the
same type of gun recovered from appellant's car when he was arrested.

 Weighing all the evidence neutrally, we hold the evidence was factually
sufficient to support appellant's conviction for the aggravated robbery of Stephens.

 We overrule appellant's third point of error.


Conclusion


 We affirm the judgments of the trial court.



 Terry Jennings

 Justice


Panel consists of Justices Nuchia, Jennings, and Radack.


Do not publish. Tex. R. App. P. 47.
1. O'Conor admitted that this was false and explained that, although he is 
married, his wife was not home at the time of the robbery and they have no 
children.
2. U.S. Const. amend. VI.
3. We note that, in closing argument, counsel for appellant made reference to the
fact that appellant had a tattoo of "Mom" on his right arm.